IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

PATRICIA GIBSON, individually and on behalf of all others similarly situated,

    Plaintiff,

    v.

ALBERTSONS COMPANIES, INC.,

    Defendant.

Case No. 22 CV 642

Hon. Georgia N. Alexakis

## MEMORANDUM OPINION AND ORDER

Defendant Albertsons Companies, Inc. ("Albertsons") makes, markets, and sells cough medicine labeled as "non-drowsy" and "daytime." Plaintiff Patricia Gibson purchased this medicine at an Albertsons grocery store in Illinois. Now she brings this suit (individually and on behalf of all others similarly situated) against Albertsons, alleging that the "non-drowsy" medicine does in fact cause drowsiness and that she was injured by Albertsons' misrepresentation. Albertsons has filed a motion to strike Gibson's class allegations [17] and a motion to dismiss Gibson's complaint for lack of standing and failure to state a claim [15].

For the reasons discussed below, the Court denies Albertsons' motion to strike Gibson's class allegations and grants Albertsons' motion to dismiss in part and denies it in part.

BACKGROUND

Albertsons makes, sells, and markets Signature Care over-the-counter cough, cold, and flu medicine containing the active ingredient dextromethorphan ("DXM").[1] [1] ¶ 1. These products state on the front of their labels that they are "non-drowsy" and for "daytime" use, as depicted in the images below. *Id.* ¶ 2. Despite these labels, Gibson alleges that DXM is known to cause drowsiness. *Id.* ¶ 3.

 

Gibson is an Illinois resident. *Id.* ¶ 6. In or around December 2021, she purchased Signature Care "Non-Drowsy" Daytime Severe Cold & Flu Relief medicine at a Jewel-Osco store in Homewood, Illinois.[2] *Id.* ¶ 38. Gibson claims she became drowsy when she took the medicine. *Id.* In addition, she maintains that she and other

---

[1] Signature Care branded products are generic versions of familiar household brands like DayQuil and Robitussin.
[2] Jewel-Osco is a Chicago-area supermarket chain and is a wholly owned subsidiary of Albertsons.

putative class members never would have purchased the medicine had they known drowsiness was a side effect. *Id.* Because they believed they were purchasing medicine that did not cause drowsiness, Gibson says that she and other consumers did not receive the "benefit of [their] bargain." *Id.*

In February 2022, Gibson filed this class action complaint alleging (1) violations of various state consumer protection laws (Count I), (2) breach of the Illinois Consumer Fraud and Deceptive Business Practices Act ("ICFA"), 815 ILCS 505/2 (Count II), (3) breach of express warranty (Count III), (4) breach of the Magnuson-Moss Warranty Act ("MMWA") (Count IV), and (5) intentional misrepresentation (Count V). Albertsons now moves to strike Gibson's class allegations and dismiss the complaint for lack of standing and failure to state a claim.

## Legal Standards

Although Federal Rule of Civil Procedure 12(f) traditionally governs motions to strike in civil litigation, "[c]ourts in this District [ ] evaluate motions to strike class allegations under Rule 23." *Buonomo v. Optimum Outcomes, Inc.*, 301 F.R.D. 292, 295 (N.D. Ill. 2014). Rule 23(c)(1)(A) provides that, "[a]t an early practicable time after a person sues or is sued as a class representative, the court must determine by order whether to certify the action as a class action." Fed. R. Civ. P. 23(c)(1)(A). "Because a class determination decision generally involves considerations that are enmeshed in the factual and legal issues comprising the plaintiff's cause of action," most often it will not be "practicable" at the pleading stage to determine the propriety of class certification. *Boatwright v. Walgreen Co.*, No. 10 C 3902, 2011 WL 843898, at *2 (N.D. Ill. Mar. 4, 2011) (internal citation omitted); *see also Buonomo*, 301 F.R.D. at 295. As

a result, "judges have generally addressed class certification at the pleading stage only when the class allegations are facially and inherently deficient." *Mednick v. Precor, Inc.*, No. 14 C 3624, 2014 WL 6474915, at *6 (N.D. Ill. Nov. 13, 2014) (quoting *Machowicz v. Kaspersky Lab, Inc.*, No. 14 C 1394, 2014 WL 4683258, at *5 (N.D. Ill. Sept. 19, 2014)).

To survive a Rule 12(b)(6) motion to dismiss, a complaint must contain a "short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). A complaint need only contain factual allegations that, accepted as true, are sufficient to "state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). A claim is plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (citing *Twombly*, 550 U.S. at 556). The allegations "must be enough to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555.

At the pleading stage, the Court must "accept all well-pleaded factual allegations as true and view them in the light most favorable to the plaintiff." *Lavalais v. Vill. of Melrose Park*, 734 F.3d 629, 632 (7th Cir. 2013). But "allegations in the form of legal conclusions are insufficient." *McReynolds v. Merrill Lynch & Co.*, 694 F.3d 873, 885 (7th Cir. 2012). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Iqbal*, 556 U.S. at 678.

DISCUSSION

Albertsons has filed a motion to strike Gibson's class allegations as well as a motion to dismiss Gibson's complaint. The Court addresses Albertsons' two motions below.

### A. Motion to Strike Class Allegations

A party seeking class certification pursuant to Rule 23 must demonstrate that "(1) the class is so numerous that joinder of all members is impracticable; (2) there are questions of law or fact common to the class; (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and (4) the representative parties will fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a). If a putative class meets these requirements, it must also satisfy the requirements in one of Rule 23(b)'s subsections. For example, Rule 23(b)(3) allows for certification of a damages class if "questions of law or fact common to class members predominate over any questions affecting only individual members[] and [ ] a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3).

First, Albertsons insists that striking the class action allegations is proper because Gibson "has alleged that only 10.4% of people experience any drowsiness after taking a medication containing dextromethorphan." [18] at 3. Yet Gibson has proposed a class that includes "*all* persons who purchased a Non-Drowsy Signature Care Product in the United States during the applicable statute of limitations." [1] ¶ 40 (emphasis added). Reasoning that approximately 90% of consumers have not

5

been harmed under this definition, Albertsons contends the proposed class is facially overbroad. *See id.*

The Court is unconvinced. Gibson does not allege that the proposed class suffered a common injury *by virtue of becoming drowsy*. Instead, she contends that "each class member paid [a] price premium and sustained economic injury" when they purchased a product that can cause drowsiness, despite being labeled as "non-drowsy." [1] ¶ 37. At this stage in the litigation, therefore, it is not obvious that an individual can experience this economic injury only if they become drowsy, and there is no need to provide a definitive answer at this early stage in the proceedings. Albertsons' argument is also a factual one. "[W]here the dispute is factual and discovery is needed to determine whether a class should be certified, it may be premature to strike class allegations." *Wright v. Fam. Dollar, Inc.*, No. 10 C 4410, 2010 WL 4962838, at *1 (N.D. Ill. Nov. 30, 2010). The occurrence of drowsiness among people who ingest DXM is exactly the sort of fact-based inquiry that would benefit from further factual development during discovery. Given these considerations, the Court finds it premature to resolve this argument at the pleading stage.

Albertsons' second argument is that Gibson cannot meet Rule 23(a)'s commonality requirement or Rule 23(b)(3)'s predominance requirement because the case presents individual questions of law and fact. [18] at 4–5. As for the individual questions of fact, Albertsons again points to differences in whether putative class members actually experience drowsiness after taking DXM. But as noted above, such fact-based questions are premature at this stage. *See Wright*, 2010 WL 4962838, at

*1. As for individualized questions of law, Albertsons points to the nationwide nature of the proposed class—specifically, that it would contain consumers in 44 U.S. states and territories. [18] at 6. But the mere fact that Gibson proposes a nationwide class does not make her class allegations deficient on their face. *See, e.g.*, *Al Haj v. Pfizer Inc.*, 338 F. Supp. 3d 741, 757 (N.D. Ill. 2018) ("Seventh Circuit precedent teaches that [multistate consumer protection] certifications are not categorically prohibited.") (citing *Martin v. Reid*, 818 F.3d 302, 308 (7th Cir. 2016)). Indeed, "the Seventh Circuit has upheld decisions to certify a nationwide class so long as 'the central questions in the litigation are the same for all class members.'" *Id.* (quoting *Pella Corp. v. Saltzman*, 606 F.3d 391, 394 (7th Cir. 2010)); *see also Al Haj*, 338 F. Supp. at 758 (rejecting motion to strike based on the nationwide nature of the class).

In sum, Gibson's class allegations do not approach the "facially and inherently deficient" standard needed for a successful motion to strike. Albertsons' motion to strike the complaint's class allegations is therefore denied without prejudice. Albertsons may raise its arguments in opposition to any Rule 23 motion brought later in these proceedings.

### B. Motion to Dismiss

Albertsons next moves to dismiss Gibson's complaint both for lack of standing and failure to state a claim. [15].[3] The Court considers each in turn.

---

[3] Albertsons frames its entire motion to dismiss as a Rule 12(b)(6) motion to dismiss for failure to state a claim. *See generally* [15]. However, because Albertsons clearly argues that Gibson lacks Article III standing in several respects, the Court construes those arguments as a motion to dismiss for lack of subject-matter jurisdiction pursuant to Rule 12(b)(1).

### 1. Article III Standing

Before reaching the merits of the dispute, the Court has "an obligation to assure [itself]" of Gibson's standing under Article III. *DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 340 (2006) (quoting *Friends of Earth, Inc. v. Laidlaw Environmental Services (TOC), Inc.*, 528 U.S. 167, 180 (2000)). The Court therefore begins by addressing Albertsons' two arguments related to Article III standing: (1) that Gibson lacks standing to bring claims related to products she did not buy, and (2) that she lacks standing to seek prospective injunctive relief.

Article III of the U.S. Constitution limits the federal courts to adjudication of "Cases" and "Controversies." U.S. Const. art. III, § 2. "Standing to bring and maintain a suit is an essential component of this case-or-controversy requirement." *Scherr v. Marriott Int'l, Inc.*, 703 F.3d 1069, 1073 (7th Cir. 2013). To establish she has standing, Gibson must allege (1) she has suffered an "injury in fact," (2) there is a "causal connection between the injury and the conduct complained of," and (3) "it must be likely … that the injury will be redressed by a favorable decision." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992) (cleaned up).

### a. Unpurchased Products

Gibson brings claims related to three products in Signature Care's "non-drowsy" line: (1) Signature Care Daytime Severe Cold & Flu Relief Liquid, (2) Signature Care Daytime Cold & Flu Relief Softgels, and (3) Signature Care Adult Cough + Chest Congestion Relief DM. [1] ¶ 12. Yet Gibson only alleges she purchased Signature Care Daytime Severe Cold & Flu Relief Liquid. *Id.* ¶ 38. As a result,

Albertsons contends that Gibson lacks Article III standing to pursue claims related to the two products she did not purchase.

There is "no controlling authority" on whether plaintiffs have standing to sue for products not purchased in a putative class action. *Wagner v. Gen. Nutrition Corp.*, No. 16-CV-10961, 2017 WL 3070772, at *5 (N.D. Ill. July 19, 2017) (quoting *Martin v. Tradewinds Beverage Co.*, CV16-9249 PSG (MRWx), 2017 WL 1712533, at *5 (C.D. Cal. Apr. 27, 2017)). However, courts tend to follow one of three approaches. Some courts categorically hold that class action plaintiffs never have standing with respect to products they have not purchased. *See, e.g.*, *Bakopoulos v. Mars Petcare US, Inc.*, No. 20 CV 6841, 2021 WL 2915215, at *2–3 (N.D. Ill. July 12, 2021). Some courts hold that a plaintiff has standing based on unpurchased products "as long as the products and alleged misrepresentations about a purchased product are substantially similar." *Wagner*, 2017 WL 3070772, at *5 (quoting 1 McLaughlin on Class Actions § 4.28 (13th ed. 2016)). And some courts treat the debate over unpurchased products as a question of typicality and adequacy of representation to be handled at the class certification phase. *See, e.g.*, *Texas Hill Country Landscaping, Inc. v. Caterpillar, Inc.*, 522 F. Supp. 3d 402, 408–09 (N.D. Ill. 2021).

This Court is persuaded by the first approach and holds that Gibson does not have Article III standing to pursue claims against products she did not purchase. Although other consumers who purchased those products may not have received the "benefit of [their] bargain," Gibson's alleged economic injury only relates to the product she personally bought. [1] ¶ 38. *Payton v. Cnty. of Kane*, 308 F.3d 673, 682

(7th Cir. 2002) ("[A] person cannot predicate standing on injury which he does not share.") (quoting *Allee v. Medrano*, 416 U.S. 802, 828–29 (1974)) (Burger, C.J., dissenting). Put another way, Albertsons' deceptive labels on the unpurchased products did not *cause* Gibson's injury—only the labels on the product she purchased did. *Lujan*, 504 U.S. at 560 ("[T]he injury has to be 'fairly … trace[able] to the challenged action of the defendant.") (quoting *Simon v. E. Ky. Welfare Rts. Org.*, 426 U.S. 26, 41–42 (1976)).

The Court also declines to delay the question for class certification. Whether or not a class is eventually certified, standing is required at the pleading stage and at each stage thereafter. *See Lujan*, 504 U.S. at 561–62. And although Gibson brings this suit as a putative class action, she is currently the only named plaintiff in the litigation. Gibson therefore "cannot bypass the 'irreducible constitutional minimum' of Article III standing for [her] individual claims" by delaying the standing analysis until class certification. *Bakopoulos*, 2021 WL 2915215, at *3 (citing *Lujan*, 504 U.S. at 560).

The Court similarly declines to merge the standing inquiry with Rule 23's requirements to certify a class. Such an approach ignores that whether Gibson experienced an injury typical of the class and whether she is an adequate class representative are "different question[s]" from Article III standing. *Bakopoulos*, 2021 WL 2915215, at *3.

For these reasons, Gibson's claims relating to products she did not purchase (namely, Signature Care Daytime Cold & Flu Relief Softgels and Signature Care

10

Adult Cough + Chest Congestion Relief DM) are dismissed with prejudice for lack of standing.

### b. Prospective Injunctive Relief

Albertsons' second argument is that Gibson lacks Article III standing to seek injunctive relief. "[T]o establish injury in fact when seeking prospective injunctive relief, a plaintiff must allege a 'real and immediate' threat of future violations of their rights." *Scherr*, 703 F.3d at 1074 (quoting *City of Los Angeles v. Lyons*, 461 U.S. 95, 102 (1983)). In other words, the threat of injury must be "actual and imminent, not conjectural or hypothetical." *Summers v. Earth Island Inst.*, 555 U.S. 488, 493 (2009).

Here, Gibson alleges that she would purchase the products again if they were actually non-drowsy. [1] ¶ 39. As a result, she says she "faces an imminent threat of harm because she will not be able to rely on the labels in the future, and thus will not be able to purchase the products." *Id.* Albertsons, for its part, contends that injunctive relief is unavailable to Gibson because she is now aware the DXM makes her drowsy and is therefore "unlikely to buy the Product" and face any future harm. [16] at 14–15.

The Seventh Circuit addressed a plaintiff's standing to pursue injunctive relief in consumer fraud cases in *Camasta v. Jos. A. Bank Clothiers, Inc.*, 761 F.3d 732 (7th Cir. 2014). The plaintiff in *Camasta* purchased shirts from a men's clothing retailer after the retailer advertised that the shirts were on "sale." *Id.* at 735. Plaintiff later learned, however, that it was the retailer's "pattern and practice to advertise normal retail prices as temporary price reductions." *Id.* To support his standing to seek

11

injunctive relief, plaintiff alleged that "[a]bsent a practical mechanism for consumers to gather together to recover for the damages Defendant's retail practices caused them, there [was] a substantial danger that these wrongful retail practices [would] continue." First Amended Complaint, *Camasta v. Jos. A. Bank Clothiers, Inc.*, No. 12-cv-07782 (N.D. Ill. Mar. 1, 2013), ECF No. 36, ¶ 46. In other words, plaintiff based his standing for injunctive relief "solely on the conjecture that because [defendant] harmed him in the past, they [were] likely to harm him in the future." *Camasta*, 761 F.3d at 740. The Circuit dismissed the argument, reasoning that "past exposure to illegal conduct does not in itself show a present case or controversy regarding injunctive relief." *Id.* (quoting *O'Shea v. Littleton*, 414 U.S. 488, 495 (1974)). In doing so, it added that because plaintiff was "now aware of [defendant's] sales practices, he [was] not likely to be harmed by the practices in the future." *Id.* at 741.

In line with this reasoning, some courts in this district have concluded that "a plaintiff's awareness of the alleged misrepresentations makes any future harm speculative, precluding that plaintiff from pursuing injunctive relief." *In re Beyond Meat, Inc., Protein Content Mktg. & Sales Practices Litig.*, No. 23 C 669, 2024 WL 726838, at *4 (N.D. Ill. Feb. 21, 2024) (collecting cases); *see also In re Herbal Supplements Mktg. & Sales Pracs. Litig.*, No. 15-CV-5070, 2017 WL 2215025, at *8 (N.D. Ill. May 19, 2017) (relying on *Camasta* to find plaintiffs could not pursue injunctive relief). In one case regarding a cake labeled as "All Butter Loaf Cake," the court offered the following explanation:

> [Plaintiff] argues that she faces an imminent threat of future harm because she "intends to, seeks to, and will purchase the Product again

12

when she can do so with the assurance that Product's representations are consistent with its composition." But merely purchasing the cake does not trigger [plaintiff's] injury. *Her injury lies in purchasing the cake under the influence of a deceptive label. There is no chance she will be tricked again by "All Butter Loaf Cake" because she now knows a quick look at the ingredients label will reveal the cake's true composition.* Therefore, the complaint fails to allege a real and immediate threat of future violations of her rights.

*Elder v. Bimbo Bakeries USA, Inc.*, 3:21-cv-637-DWD, 2022 U.S. Dist. LEXIS 47948, *8 (emphasis added).

So *Camasta* forecloses a plaintiff from establishing standing based on the risk of being deceived again. But Gibson alleges a different sort of injury. She does not allege that Albertsons will dupe her again. Instead, she alleges that, because Albertsons deceived her in the past, she cannot rely on the product's label to be true in the future and is thus prevented from purchasing the product altogether even though she would like to. *See* [1] ¶ 39 ("Plaintiff would purchase [the products] again if they were actually "Non-Drowsy" …. Plaintiff, however, faces an imminent threat of harm because she will not be able to rely on the labels in the future, and thus will not be able to purchase the products."). Put another way, Gibson alleges an injury that persists even though she is now aware of Albertsons' past deception: an ongoing inability to purchase a product she otherwise would purchase were it not for an ongoing sense of mistrust.

Given this distinction, *Camasta* does not prevent Gibson from seeking injunctive relief. As the Ninth Circuit explained when concluding that a once-deceived plaintiff had standing to seek injunctive relief in a consumer fraud action:

13

> Knowledge that the advertisement or label was false in the past does not equate to knowledge that it will remain false in the future. *In some cases, the threat of future harm may be the consumer's plausible allegations that she will be unable to rely on the product's advertising or labeling in the future, and so will not purchase the product although she would like to.* In other cases, the threat of future harm may be the consumer's plausible allegations that she might purchase the product in the future, despite the fact it was once marred by false advertising or labeling, as she may reasonably, but incorrectly, assume the product was improved. Either way … we are not persuaded that injunctive relief is never available for a consumer who learns after purchasing a product that the label is false.

*Davidson v. Kimberly-Clark Corporation*, 889 F.3d 956, 970–71 (9th Cir. 2018) (emphasis added) (internal citation and quotation marks omitted).[4]

The Court has no reason to doubt the truth of Gibson's allegation that she would purchase the Signature Care product again were it not for her ongoing inability to rely on Albertsons' claims. Indeed, the Court is obligated to construe this allegation in Gibson's favor. Having done so, the Court concludes that Gibson has alleged an actual and imminent threat of future harm—one distinct from the harm alleged by the plaintiff in *Camasta*—and thus has standing to seek prospective injunctive relief.

## 2. Failure to State a Claim

### a. Federal Preemption

Albertsons argues that Gibson's state law claims are preempted by federal law. The Supremacy Clause of the United States Constitution provides that the

---

[4] Some courts have pointed out that, under *Camasta*'s reasoning, "consumer protection statutes such as ICFA could never be invoked to enjoin deceptive practices if the complaining consumer's standing dissipated the moment she discovered the alleged deception and could no longer be fooled." *Leiner v. Johnson & Johnson Consumer Cos., Inc.*, 215 F. Supp. 3d 670, 673 (N.D. Ill. 2016). Although the Court acknowledges this important policy concern, its analysis is grounded in the fact that Gibson alleges a variety of future harm distinct from that which was alleged in *Camasta*.

Constitution and federal laws are the "supreme Law of the Land." U.S. Const. art. VI, cl. 2. Consistent with this principle, the Supremacy Clause "invalidates state laws that 'interfere with, or are contrary to,' federal law." *Hillsborough Cnty., Fla. v. Automated Med. Lab'ys, Inc.*, 471 U.S. 707, 712 (1985) (quoting *Gibbons v. Ogden*, 9 Wheat. 1, 211, 6 L.Ed. 23 (1824)).

Federal preemption can take three forms. First, Congress may preempt state law "by so stating in express terms." *Id.* at 713. Second, in the absence of express preemption, Congress' intent to preempt state law in a particular area is inferred "where the scheme of federal regulation is sufficiently comprehensive to make reasonable the inference that Congress 'left no room' for supplementary state regulation." *Id.* (quoting *Rice v. Santa Fe Elevator Corp.*, 331 U.S. 218, 230 (1947)). Third, "state law is nullified to the extent that it actually conflicts with federal law;" in other words, "compliance with both federal and state regulations is a physical impossibility." *Id.* (quoting *Fla. Lime & Avocado Growers, Inc. v. Paul*, 373 U.S. 132, 142–43 (1963)).

The Federal Food, Drug, and Cosmetic Act of 1938 ("FDCA") regulates the marketing and labeling of drugs in an effort "to protect the health and safety of the public at large." *POM Wonderful LLC v. Coca-Cola Co.*, 573 U.S. 102, 108 (2014). The FDCA contains an express preemption provision. Specifically, the provision prohibits states from establishing any requirement "that is different from or in addition to, or that is otherwise not identical with, a requirement under this chapter." 21 U.S.C. § 379r(a)(2). Put another way, the FDCA preempts "state-law theories that impose

requirements 'not identical' to its own requirements." *Benson v. Fannie May Confections Brands, Inc.*, 944 F.3d 639, 645 (7th Cir. 2019). Also relevant here, the FDCA prohibits misbranding of a drug. *See* 21 U.S.C § 352. Misbranding occurs if a drug's "labeling is false or misleading in any particular." *Id.* § 352(a)(1).

The FDCA regulates the sale of over-the-counter ("OTC") drugs. *See* 21 U.S.C. § 301 *et seq*. To do so, it issues "monographs," which are detailed regulations setting conditions under which specific drugs may qualify as safe, effective, and not misbranded when sold over the counter. *See, e.g.*, 21 C.F.R. § 330.1. For OTC drugs, the FDA sets out a series of general rules and then it promulgates monographs containing specific rules for more specific categories of drugs (e.g., antacids). *See Stephens v. Target Corp.*, 694 F. Supp. 3d 1136, 1140 (D. Minn. 2023). The monograph sets dosage and labeling requirements for each drug, including warning labels. 21 C.F.R. Ch. I, Subch. D, Pts. 331–58.

The monograph for OTC antitussives (which covers the cough medicine at issue) appears at 21 C.F.R. § 341(b)(3). Relevant here, § 341(b)(3) requires drowsiness warnings for certain antitussive drugs, but it does not require a drowsiness warning for drugs containing DXM. *See id.* § 341.74(c)(4). The sole window into the FDA's reasoning comes from the FDA's evaluation of a claim that an antitussive helps a user sleep by quieting a cough. *Stephens*, 694 F. Supp. 3d at 1140. Although the FDA acknowledged that some literature "describes slight drowsiness as a side effect for … dextromethorphan preparations," the agency said it was "not aware of data

demonstrating that the antitussive ingredients codeine and dextromethorphan … require a drowsiness warning." 48 Fed. Reg. at 48,589.

Albertsons insists that Gibson's state law claims are expressly preempted because she "seeks to impose requirements that are different from those imposed by the final monograph governing dextromethorphan." [16] at 5. In other words, Albertsons reasons, because the FDA requires drowsiness warnings for other drugs but not those containing DXM, Gibson's claims challenging the "non-drowsy" label are inconsistent with FDA requirements. Gibson counters that, because her goal is not to add a drowsiness labeling requirement for DXM, such a requirement is not different from what the FDA already prescribes. Instead of challenging the absence of a drowsiness warning, Gibson takes issue with the label's affirmative misrepresentation that the medicine is "non-drowsy."

This Court is not the first to resolve this debate. District courts around the country (and at least two in this district) have already weighed in, and they have reached mixed answers. Some courts (including the two in this district) have concluded that federal law would preempt a state-law attempt to add a drowsiness warning, but it does not preempt a state law that, like here, prohibits an affirmative misrepresentation that the medicine is "non-drowsy." *See, e.g.*, *Harris v. Supervalu, Inc.*, No. 22-cv-2863, ECF No. 35 (N.D. Ill. July 16, 2024); *Nancy Calchi v. TopCo Associates, LLC*, No. 22-CV-747, 2024 WL 4346420, at *10 (N.D. Ill. Sept. 30, 2024); *Stephens*, 694 F. Supp. 3d at 1146; *Davis v. The Kroger Co.*, No. 222CV02082MEMFRAOX, 2023 WL 9511156, at *5–8 (C.D. Cal. Sept. 22, 2023);

*Lemus v. Rite Aid Corp.*, 613 F. Supp. 3d 1269, 1276 (C.D. Cal. 2022). Other courts have taken a broader view of the "identical" requirement in the FDCA's express preemption provision. Those courts reason that because the "subject of whether cough medicines with DXM should carry a drowsiness label [ ] was explicitly considered by the FDA," a prohibition on a "non-drowsy" label imposes a requirement "different from" the FDCA. *Goldstein v. Walmart*, Inc., 637 F. Supp. 3d 95, 111 (S.D.N.Y. 2022); *see also Calchi v. GlaxoSmithKline Consumer Healthcare Holdings (US) LLC*, 2023 WL 2447399, at *2 (S.D.N.Y. 2023); *Amara v. Publix Supermarkets, Inc.*, No. 8:22-CV-367-VMC-JSS, 2022 WL 3357575, at *4–5 (M.D. Fla. Aug. 15, 2022) (adding a drowsiness warning versus removing the term "non-drowsy" is a "distinction without a difference").

Having reviewed the arguments on both sides, the Court adopts the reasoning in the former set of cases and finds that federal preemption does not bar Gibson's state law claims. As the court reasoned in *Harris*, Gibson "seek[s] to stop Defendant from adding deceptive language to federally permitted labels." [65-1] at 11; *Harris*, No. 22-cv-2863, ECF No. 35. A prohibition on deceptive language is distinct from a state law requirement that sellers must *add* a drowsiness warning. Where the FDCA is silent on what a seller cannot say, "states have a little room to maneuver." *Calchi*, 2024 WL 4346420, at *9.

The Court's holding is consistent with the Seventh Circuit's opinion in *Bell v. Publix Super Markets, Inc.*, 982 F.3d 468 (7th Cir. 2020). There, defendants sold cheese products labeled as "100% Grated Parmesan Cheese." *Id.* at 473. Plaintiffs

sued defendants, claiming this statement was deceptive under state consumer protection laws. *Id.* Like here, defendants pointed to the FDCA's express preemption clause, insisting that a state-law prohibition on certain statements would not be "identical" to the FDCA's own label requirements for cheese. *Id.* at 483.

The Circuit rejected defendant's express preemption argument and allowed plaintiffs' state law claims to proceed. *Id.* It reasoned that, because federal regulations do not address when cheese can be labeled as "100%," a state prohibition on such a statement did "not establish any new requirement different from the [FDCA standards]." *Id.* at 484. The Circuit offered the following example:

> If an FDCA standard of identity said that a vegetable label must indicate the vegetable's "color, date of harvest, and common name," the preemption provision would prohibit a state from adding a further requirement that all vegetable labels also list the country of origin. The absence of such a requirement in the federal law operates to exclude it. But if a seller chose voluntarily to add a country of origin—and lied about it—then § 343-1(a)(1) would not preempt state law from requiring the seller to remove the voluntarily-added lie. After all, there are all sorts of potentially misleading additions that standards of identity do not explicitly ban.
>
> Closer to this case, as in our hypothetical standard for a vegetable, the actual standard for grated cheese says nothing about a cheese's country of origin. Suppose a defendant here labeled its product "Grated Parmesan Cheese, 100% from Italy." If the cheese did not actually come from Italy, state-law claims for deceptive advertising would not be preempted simply because the federal standard of identity does not explicitly ban such a statement. Such a result would stretch the FDCA's "not identical to" language for express preemption beyond its breaking point.

*Id.* at 484–85 (internal citation omitted). Based on this reasoning, the Circuit concluded that "while states may not require sellers to add further labeling that is

19

not required by federal law, they may prevent sellers from voluntarily adding deceptive content that is not required by federal law." *Id.* at 485.

So under *Bell*, a state cannot require Albertsons to add a drowsiness warning to its label. Such a requirement would do precisely what the FDCA already does (*i.e.*, decide whether a drowsiness warning label is required). But a state *may* prohibit Albertsons from choosing to represent that its medicine is "non-drowsy," as the FDCA does not already dictate when the "non-drowsy" label is (or is not) permitted.

Indeed, to the extent the FDCA *does* regulate the "non-drowsy" label, the law prohibits sellers from using false and misleading labels. *See* 21 U.S.C. § 352(a)(1); *see also* 21 C.F.R. § 330.1(c) (OTC drugs must be "labeled in compliance with chapter V of the [FDCA]"). This federal prohibition against false and misleading labels is "identical" to the state laws at issue here, which similarly prohibit deceptive mislabeling. As a result, the state laws do not run afoul of § 379r(a)(2)'s express preemption provision. *See also Calchi*, 2024 WL 4346420, at *9 ("The FDCA already prohibits 'false or misleading' labeling, so a state law that prohibits false or misleading labeling doesn't create a new requirement different from the FDCA."); *Stephens*, 694 F. Supp. 3d at 1146 ("Plaintiffs are thus pursuing parallel state-law claims by attempting to use state law to independently enforce FDA regulations against false and misleading labeling.") (cleaned up).

Based on this reasoning, the Court concludes that Gibson's claims are not preempted by federal law.

### b. Plausibility of Allegations

### 1. Whether the "Non-Drowsy" Label Is False

Albertsons next argues that all five of Gibson's counts should be dismissed because she "fails to allege facts sufficient to plausibly allege that the non-drowsy label claim is false." [16] at 7. In doing so, Albertsons contends that the FDA already explicitly considered the issue and stated that "[t]he agency is not aware of data demonstrating that the antitussive ingredient[] … dextromethorphan … require[s] a drowsiness warning." *Id.* (quoting 48 Fed. Reg. at 48,589).

At this juncture, the Court takes all well-pleaded facts as true. *See Lavalais*, 734 F.3d at 632. And Gibson's allegations, taken as true, do more than enough to establish that DXM causes drowsiness. Gibson cites four pieces of evidence to make her point. First, she cites a MedlinePlus webpage—a service provided by the National Library of Medicine—that lists drowsiness as one of DXM's side effects. [1] ¶ 19. Second, Gibson cites a scientific study which found that around ten percent of those who use DXM products develop drowsiness within three days of starting treatment. *Id.* ¶ 20. Third, she cites the FDA's adverse event report database, which Gibson says shows that drowsiness is one of the most cited side effects of products containing DXM. *Id.* ¶ 21. And finally, Gibson cites the Federal Aviation Administration's prohibition on pilots ingesting DXM before flying, which suggests that DXM can cause drowsiness and interfere with a pilot's performance. *Id.* ¶ 22.

Albertsons' motion to dismiss picks at these four pieces of evidence, attempting to show why each one falls short of establishing that DXM causes drowsiness. But

assessing the reliability or weight of each piece of evidence is outside this Court's role at the pleading stage. *See Lavalais*, 734 F.3d at 632; *Spector v. Mondelez Int'l, Inc.*, No. 15 C 4298, 2017 WL 4283711, at *7 (N.D. Ill. Sept. 27, 2017) ("The Court agrees that it should not resolve disagreements over interpretation of studies on a motion to dismiss."). Here, Gibson's four pieces of evidence all suggest—at least on their surface—that DXM can cause drowsiness. Albertsons' suggestion that the Court "independently examine and form its own opinions about the document[s]" is better left to later stages in the proceedings.[5] [16] at 10; *see also Stephens*, 694 F. Supp. 3d at 1141–42 (rejecting identical argument that plaintiff had not plausibly alleged that defendant's "non-drowsy" and "daytime" labels were false).

### 2. Actual Damages

Albertsons also moves to dismiss Gibson's ICFA, breach of warranty, and intentional misrepresentation claims on the grounds that Gibson failed to plead actual damages, which are required elements of those claims.

The Seventh Circuit has suggested that—in the context of an ICFA action brought by an individual consumer—actual loss occurs when "the seller's deception deprives the plaintiff of 'the benefit of her bargain' by causing her to pay 'more than the actual value of the property.'" *Kim v. Carter's Inc.*, 598 F.3d 362, 365 (7th Cir. 2010) (quoting *Mulligan v. QVC, Inc.*, 382 Ill.App.3d 620, 628 (1st Dist. 2008)). A

---

[5] Even if we were to further dissect the evidence at this stage, some of Albertsons' arguments misrepresent the data Gibson cites. For example, Albertsons takes issue with Gibson's reliance on the MedlinePlus webpage, claiming the website indicates drowsiness is only a symptom of overdose. [16] at 7. But the Court's review of the relevant website indicates that, in addition to citing drowsiness as a symptom of overdose, it also cites drowsiness as a general side effect.

plaintiff "is entitled to be placed in the same financial position she would have been absent the misrepresentation." *Frye v. L'Oreal USA, Inc.*, 583 F. Supp. 2d 954, 957 (N.D. Ill. 2008) (citing *Price v. Philip Morris, Inc.*, 219 Ill.2d 182, 277 (2005) (Karmeier, J. concurring)).

Here, Gibson alleges that she "did not receive the benefit of her bargain because her Non-Drowsy Signature Product was not, in fact, 'Non-Drowsy' or a 'Daytime' medication." [1] ¶ 38. She also alleges that she "would not have bought this product had she known that the product did, in fact, cause drowsiness, and that drowsiness was a known side-effect of the product." *Id.*

Albertsons contends that Gibson has not sufficiently pled actual damages because she fails to allege "the price of that product or any other comparable products to demonstrate a price premium." [16] at 14. For support, Albertsons points to *Sabo v. Wellpet, LLC*, 282 F. Supp. 3d 1040 (N.D. Ill. 2017). In *Sabo*, plaintiff alleged that he "paid more for defendant's pet food products because he believed they were American made" and that "comparable pet food products that lacked domestic-source designations were less expensive." *Id.* at 1041. To support this theory of pecuniary harm, he pointed to "surveys and scholarship suggesting that American consumers are willing to pay more for American-made products." *Id.* (cleaned up).

The court in *Sabo* concluded that plaintiff's allegations were not enough to plead actual damages because he did not "bridge the gap" between the scholarship and "what he and the putative class actually paid when purchasing defendant's pet food." *Id.* The court noted, for example, that the complaint lacked assertions about

23

the "price of defendants' products," the "price of comparable products not labeled 'Made in the USA,'" or "any other measurable criteria for comparing the position plaintiff and the class would have been in absent the alleged fraud with the position they were in as a result of their reliance on defendant's … representation." *Id.* at 1042.

*Sabo* is a clear outlier compared to the "[n]umerous courts" that have permitted claims for actual damages to proceed where plaintiffs have alleged they would not have purchased the product at the same price or at all absent the misrepresentation. *Rudy v. Fam. Dollar Stores, Inc.*, 583 F. Supp. 3d 1149, 1160 (N.D. Ill. 2022). In *Terrazzino v. Wal-Mart Stores, Inc.*, for example, plaintiff alleged that she would not have purchased pita chips labeled as "all natural" had she known the label to be false. 335 F. Supp. 3d 1074, 1084 (N.D. Ill. 2018). Like here, defendant argued that plaintiff failed to allege any more facts suggesting that the pita chips were worth less than what she paid for them. *Id.* The district court rejected this argument and concluded that plaintiff's "allegation[s] that she paid more for the Pita Chips because they were labeled as 'All Natural,'" and that "she would not have bought the Pita Chips if she had known that they were not, in fact, 'All Natural,' [were] sufficient to allege actual damages." *Id.* at 1085; *see also Block v. Lifeway Foods, Inc.*, No. 17 C 1717, 2017 WL 3895565, at *5 (N.D. Ill. Sept. 6, 2017) (plaintiff sufficiently pled actual damages where he alleged he would not have purchased the product without the misrepresentation); *Biffar v. Pinnacle Foods Grp.*, LLC, No. 16-0873-DRH, 2016 WL 7429130, at *4 (S.D. Ill. Dec. 22, 2016) (same); *McDonnell v. Nature's Way Prod., LLC,*

24

No. 16 C 5011, 2017 WL 1149336, at *3 (N.D. Ill. Mar. 28, 2017) (plaintiff adequately pled actual damages by alleging she would not have purchased the product at the same price).

At the pleading stage, the Court must take as true Gibson's allegation that she would not have purchased the product had she known it causes drowsiness. *See Iqbal*, 556 U.S. at 678. The Court therefore agrees with the majority of cases that have found similar allegations sufficient to overcome a defendant's motion to dismiss. Accordingly, Albertsons' motion to dismiss is denied as to Gibson's pursuit of actual damages.

### c. Illinois Consumer Fraud and Deceptive Business Practices Act Count (II)

Albertsons next asks the Court to dismiss Count II, which Gibson brings pursuant to the Illinois Consumer Fraud and Deceptive Business Practices Act ("ICFA"), 815 ILCS 505/1 *et seq*. The ICFA provides a remedy for "unfair methods of competition and unfair or deceptive acts or practices" in certain commercial transactions. 815 ILCS 505/2. An "unfair or deceptive act[] or practice[]" includes, among other things, the use of "deception, fraud, false pretense, false promise, [or] misrepresentation." *Id.*

To state a claim under the ICFA, a plaintiff must allege: "(1) a deceptive or unfair act or practice by the defendant; (2) the defendant's intent that the plaintiff rely on the deceptive or unfair practice; and (3) the unfair or deceptive practice occurred during a course of conduct involving trade or commerce." *Wigod v. Wells Fargo Bank, N.A.*, 673 F.3d 547, 574 (7th Cir. 2012). As with other varieties of fraud,

25

ICFA claims are subject to Rule 9(b)'s heightened pleading standard. *See Greenberger v. GEICO Gen. Ins. Co.*, 631 F.3d 392, 399 (7th Cir. 2011).

"A breach of contractual promise, without more, is not actionable under the [Illinois] Consumer Fraud Act." *Avery v. State Farm Mut. Auto. Ins. Co.*, 216 Ill. 2d 100, 169 (2005). In *Avery*, policyholders sued State Farm for breach of contract and violation of the ICFA based on State Farm's alleged failure to restore their cars to their pre-loss condition using parts of like kind and quality, as their policies required. *Id.* at 110–11. The Illinois Supreme Court held that the policyholders could not proceed on their ICFA claim because it was essentially a repackaged version of its claim for breach of contract. *Id.* According to the court, "a 'deceptive act or practice' involves more than the mere fact that a defendant promised something and then failed to do it." *Id.* at 169 (quoting *Zankle v. Queen Anne Landscaping*, 311 Ill.App.3d 308, 312 (2d Dist. 2000)). Otherwise, the ICFA would "supplement every breach of contract claim with a redundant remedy." *Id.* (quoting *Zankle*, 311 Ill.App.3d at 312).

In *Greenberger*, the Seventh Circuit considered whether a plaintiff stated an ICFA claim against GEICO based on "nearly identical" conduct. 631 F.3d at 399. Relying on *Avery*, it held that the allegations supporting plaintiff's ICFA were "nothing more than restatements of the claimed breach of contract, albeit using the language of fraud." *Greenberger*, 631 F.3d at 399. The Circuit then instructed that "[w]hen allegations of consumer fraud arise in a contractual setting, the plaintiff must prove that the defendant engaged in deceptive acts or practices distinct from any underlying breach of contract." *Id.* Because the plaintiff had not offered any

misrepresentation apart from his breach of contract claim, the Circuit affirmed the dismissal of his ICFA claim. *Id.* at 400.

Although a breach of contract and ICFA claim may not rest on the "same factual foundation" under *Greenberger*, the mere *existence* of an underlying contract does not doom a parallel consumer fraud claim. *Id.* Indeed, "a widespread, systematic practice of engaging in unfair or deceptive conduct, even in a contractual setting, may be actionable under the statute." *Id.* Although the *Greenberger* court did not specify what facts a plaintiff must plead in cases of widespread deceit, it suggested that "affirmative acts of misrepresentation" may suffice. *Id.* at 400 (distinguishing cases alleging "affirmative acts of misrepresentation" from those alleging "a simple breach of contract multiplied over a prospective plaintiff class").

Albertsons argues that Gibson's ICFA claim cannot proceed under *Greenberger* because she "has not identified any alleged deception other than in connection with the purported express warranty." [16] at 11. Put differently, Albertsons contends that Gibson's consumer fraud claim fails because it rests on the "same factual foundation" as her breach of express warranty claim. *Id.* (quoting *Greenberger*, 631 F.3d at 399).

The Court disagrees. Gibson's allegations go beyond the mere fact that the "non-drowsy" warranty on Albertsons' label turned out to be false. Instead, she alleges that (1) Albertsons researched the known and common side effects of DXM and therefore knew DXM causes drowsiness, (2) the company knew that the "non-drowsy" and "daytime" labels would be misleading to consumers, (3) it knew consumers would rely on the misleading labels, and (4) as a result of the misleading

labels, consumers would purchase more of the "non-drowsy" products at a premium price. *See* [1] ¶ 35. These facts make Gibson's ICFA claim more than "a simple breach of contract multiplied over a prospective plaintiff class." *Greenberger*, 631 F.3d at 400; *see also Muir v. Nature's Bounty, Inc.*, No. 15 C 9835, 2017 WL 4310650, at *6 (N.D. Ill. Sept. 28, 2017) (permitting ICFA claim where plaintiff alleged company intentionally misrepresented that its herbal supplement contained hypericin); *Bakopoulos*, 2021 WL 2915215, at *6 (permitting ICFA claim where plaintiff alleged company intended to mislead consumers when it labeled its dog food as free from certain ingredients).[6] Instead, she lays out a scheme in which Albertsons intentionally misrepresented that its products were non-drowsy to induce consumer reliance, charge a premium, and make more money. *See* [1] ¶¶ 18, 35, 37, 61.

In sum, this Court reads *Greenberger* to allow an ICFA claim based on an intentional misrepresentation to proceed when a plaintiff alleges "something more" than garden-variety breach of contract. Gibson alleges that "something more" here. Accordingly, the Court denies Albertsons' motion to dismiss Gibson's ICFA claim.

### d. Breach of Express Warranty (Count III)

Albertsons next argues that Gibson's breach of warranty claim in Count III should be dismissed for failure to provide proper notice. Section 2–607 of the Uniform

---

[6] Albertsons points the Court to two additional cases in support of its motion to dismiss Gibson's ICFA claim. *See Parrot v. Family Dollar, Inc.*, 17 C 222, 2018 WL 2118195, at *4 (N.D. Ill. May 8, 2018); *Lambert v. Dollar General Corp.*, No. 16 C 11319, 2017 WL 2619142, at *6 (N.D. Ill. Oct. 19, 2017). But Albertsons does not attempt to compare the allegations in those cases to the allegations at hand. And, although the Court acknowledges that courts in this district have sometimes disagreed on how broadly to read *Greenberger*, the Court finds the reasoning in cases like *Muir* and *Bakopoulos* most persuasive.

Commercial Code ("UCC")—codified in Illinois at 810 ILCS 5/2–607(3)(a)—provides that a "buyer must within a reasonable time after he discovers or should have discovered any breach notify the seller of breach or be barred from any remedy." This means that, under Illinois law, buyers "must directly notify the seller of the troublesome nature of the transaction or be barred from recovering for a breach of warranty." *Connick v. Suzuki Motor Co.*, 174 Ill.2d 482, 492 (1996). The notice requirement is excused if (1) the seller already has actual knowledge of the product's defect, or (2) the consumer suffers a personal injury (in which case the notice requirement may be satisfied by filing suit). *Id.* at 492, 494–95.

"The purpose of the notice requirement is to encourage parties to resolve the dispute short of litigation." *Ibarrola v. Kind, LLC*, 83 F. Supp. 3d 751, 760 (N.D. Ill. 2015); *see also* 810 ILCS Ann. 5/2–607, cmt. 4 (notice requirement "opens the way for normal settlement through negotiation"). In determining whether Gibson has met the notice requirement, the Court holds her to a standard of good faith. 810 ILCS 5/2–607, cmt. 5.

Here, Gibson purchased and used Albertsons' product in or around December 2021. [1] ¶ 38. Approximately one full month later, she mailed to Albertsons headquarters a written notice of her injury on January 31, 2022. *Id.* ¶¶ 55, 73, 81. She filed this suit four days later. *Id.* at 23. Albertsons argues this was not a "good faith" attempt to provide pre-suit notice because it allowed no time for settlement discussions. Gibson responds with two arguments. First, she maintains that pre-suit notice was not required at all because Albertsons had actual knowledge of the defect

before the suit. Second, in the alternative, she contends that whether her notice was sufficient is a factual question that should be reserved for now.

Gibson's first argument related to Albertsons' actual knowledge fails. The actual knowledge exception to the notice requirement "is satisfied only where the manufacturer is somehow apprised of the trouble with the particular product *purchased by a particular buyer*." *Connick*, 174 Ill.2d at 494 (emphasis added). Here, Gibson's complaint alleges that Albertsons "researched the known and common side effects of DXM," [1] ¶ 35, but she does not allege that Albertsons knew about *Gibson's* specific transaction and the resulting breach. *See Connick*, 174 Ill.2d at 493–94 (citing *Am. Mfg. Co. v. U.S. Shipping Bd. Emergency Fleet Corp.*, 7 F.2d 565, 566 (2d Cir. 1925) (defendant must know about "*buyer's* claim that [the facts] constitute a breach") (emphasis added)). The actual knowledge exception therefore does not apply to excuse the notice requirement here.

As for Gibson's second argument, she is correct that "[w]hether sufficient notice has been provided is generally a question of fact to be determined based upon the particular circumstances of each case." *Maldonado v. Creative Woodworking Concepts, Inc.*, 296 Ill. App. 3d 935, 940 (3d Dist. 1998) (citing *Berry v. G. D. Searle & Co.*, 56 Ill.2d 548, 556 (Ill. 1974)). That said, "[w]hen no inference can be drawn from the evidence other than that the notification was unreasonable, the question can be decided by the court as a matter of law." *Id.*

Although Albertsons frames its argument around whether Gibson provided notice in "good faith," the Court considers the more relevant question to be whether

30

Gibson's four-day notice was "within a reasonable time" such that it would give the parties time to resolve the dispute short of litigation (*e.g.*, by curing the defect or reaching a settlement). 810 ILCS 5/2–607(3)(a); *see also Ibarrola*, 83 F. Supp. 3d at 760. Here, the Court concludes as a matter of law that it was not. Even assuming Albertsons received the notice in the mail as quickly as two days after it was sent, the remaining two days before Gibson filed suit were not enough for a large corporation like Albertsons to cure the defect or to engage Gibson in settlement discussions. *See Stephens*, 694 F. Supp. 3d at 1147 (two-day notice unreasonable as a matter of law under Section 2–607 because it "is not enough time for a large corporation like Target to process a refund in response to a pre-litigation demand letter sent to the general counsel's office").[7]

Accordingly, Gibson's Count III claim for breach of express warranty is dismissed with prejudice.

### e. Magnuson-Moss Warranty Act (Count IV)

Albertsons next moves to dismiss Gibson's Count IV claim under the Magnuson-Moss Warranty Act ("MMWA"). The MMWA "allows consumers to enforce limited written and implied warranties in federal court, as provided in section 2310(d)(1), borrowing state law causes of action." *Anderson v. Gulf Stream Coach,*

---

[7] *But see Stearns v. Select Comfort Retail Corp.*, 763 F Supp. 2d 1128, 1143 & n.6 (N.D. Cal. 2010) (phone call three days before filing suit met Section 2–607's notice requirement at pleading stage, but where defendants did not attack the sufficiency of notice and whether it was a long enough period for them to respond appropriately); *Kessler v. Samsung Elecs. Am. Inc.*, No. 17-C-0082, 2018 WL 7502913, at *5 (E.D. Wis. Feb. 16, 2018) (phone call "mere days" before filing suit was sufficient, but where defendant "flatly refused to take any corrective action" upon learning of plaintiff's complaints).

*Inc.*, 662 F.3d 775, 781 (7th Cir. 2011) (quoting *Schimmer v. Jaguar Cars, Inc.*, 384 F.3d 402, 405 (7th Cir. 2004)) (cleaned up). In other words, the MMWA does not provide an independent basis for liability; it only provides for federal jurisdiction for some state claims." *Priebe v. Autobarn, Ltd.*, 240 F.3d 584, 587 (7th Cir. 2001) (citing 15 U.S.C. § 2310(d)).

Because it does not provide an independent basis for liability, a "claim under the [MMWA] depends on the existence of a viable underlying state law warranty claim." *Schiesser v. Ford Motor Co.*, No. 16 C 730, 2017 WL 1283499, at *4 (N.D. Ill. Apr. 6, 2017); *see also O'Connor v. Ford Motor Co.*, 477 F. Supp. 3d 705, 717 (N.D. Ill. 2020). Here, because Gibson's state law warranty claim fails for inadequate notice, she cannot also state an independent claim under the MMWA.

In any case, to bring an action pursuant to § 2310(d)(1), "the consumer must have given the warrantor a reasonable opportunity to cure its failure to comply with an obligation under any written or implied warranty." *Anderson*, 662 F.3d at 781 (quoting 15 U.S.C. § 2310(e)) (cleaned up). For the same reasons discussed in the context of the breach of warranty claim, Gibson's notice—mailed only four days before she filed suit—did not provide Albertsons "a reasonable opportunity to cure." 15 U.S.C. § 2310(e).[8] The Court therefore dismisses Gibson's Count IV claim under the MMWA with prejudice.

---

[8] Albertsons makes several additional arguments as to why Gibson's MMWA claim should fail, but the Court does not discuss those points given the lack of an underlying warranty claim on which to base her MMWA claim.

CONCLUSION

For the foregoing reasons, the Court denies Albertsons' motion to strike Gibson's class allegations. [17]. The Court grants in part and denies in part Albertsons' motion to dismiss. [15]. The Court dismisses with prejudice all claims related to products Gibson did not purchase as well as Gibson's breach of warranty (Count III) and MMWA (Count IV) claims. Albertsons' motion to dismiss is denied in all other respects.

The Court directs Albertsons to answer Gibson's complaint on or before November 18, 2024. The parties are further directed to file on or before December 2, 2024, a joint plan for the completion of discovery.

Georgia N. Alexakis
United States District Judge

Date: 10/17/24